UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

JAMES M. RAY                                    CIVIL ACTION

VERSUS                                          NUMBER: 11-01178

MICHAEL J. ASTRUE,                              SECTION: "N"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Disability Insurance Benefits ("DIB").  (Rec. docs. 9, 11).

James M. Ray, plaintiff herein, filed the subject application for DIB on August 12, 2009, with a protective filing date of August 4, 2009, alleging disability as of July 28, 2009. (Tr. pp. 94-97, 123).  In an undated Disability Report that was presumably completed around the time that he applied for DIB, the condition resulting in plaintiff's inability to work was identified as a neck

injury. (Tr. pp. 146-154). Plaintiff's application for DIB was denied at the initial level of the Commissioner's administrative review process on September 9, 2009. (Tr. pp. 53-56). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on February 23, 2010 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 59, 21-51). On July 1, 2010, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 6-19). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision on April 29, 2011, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-3). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §405(g).

In his cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

1. [t]he ALJ's RFC finding that Mr. Ray can perform a reduced range of light work is not supported by substantial evidence.

2. [t]he ALJ erred in failing to consider the fact that Plaintiff was awarded Veteran's Administration disability benefits.

(Rec. doc. 9-2, p. 3).

Relevant to the issues to be decided by the Court are the

following findings that were made by the ALJ:

1. [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2013.

2. [t]he claimant has not engaged in substantial gainful activity since July 28, 2009, the alleged onset date (20 CFR 404.1571 et seq.).

3. [t]he claimant has the following severe impairments: degenerative disc disease of [the] cervical spine status post laminectomy (20 CFR 404.1520(c)); Stone v. Heckler, 752 F.2d 1099 (5th Cir. 1985).

4. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR, Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5. [a]fter careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) with the following additional limitations: sit and stand alternatively at will, providing the claimant is not off task more than 10% of the work period; no repetitive movements of the neck; only frequent reaching, bilaterally; only occasional overhead reaching, bilaterally; never climb ladders, ropes and scaffolds; and occasionally climb ramps and stairs, balance, stoop, kneel, crawl.

6. [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. [t]he claimant was born on December 8, 1957 and was 51 years old, which is defined as a an individual closely approaching advanced age, on the alleged disability onset date. (20 CFR 404.1563).

8. [t]he claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that

the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR 404, Subpart P, Appendix 2).

10. [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. [t]he claimant has not been under a disability, as defined in the Social Security Act, from July 28, 2009, through the date of this decision (20 CFR 404.1520(g)).

(Tr. pp. 11-12, 14, 15).

Judicial review of the Commissioner's decision to deny DIB is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. <u>Anthony v. Sullivan</u>, 954 F.2d 289, 292 (5th Cir. 1992); <u>Villa v. Sullivan</u>, 895 F.2d 1019, 1021 (5th Cir. 1990); <u>Fraga v. Bowen</u>, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. <u>Johnson v. Bowen</u>, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion. <u>Jones v. Heckler</u>, 702 F.2d 616, 620 (5th Cir. 1983). The Court may not reweigh the evidence or try the issues <u>de novo</u>, nor may it substitute its judgment for that of the Commissioner. <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve, not the courts. <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB bears the burden of proving that he is disabled within the meaning of the Social Security Act. <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). Once the claimant carries his initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled. <u>Harrell</u>, 862 F.2d at 475. In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §404.1520, as follows:

> 1. an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

> 2. an individual who does not have a "severe

impairment" will not be found to be disabled.

3. an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be considered disabled without consideration of vocational factors.

4. if an individual is capable of performing the work that he has done in the past, a finding of "not disabled" must be made.

5. if an individual's impairment precludes him from performing his past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that he is disabled and must ultimately demonstrate that he is unable to perform the work that he has done in the past. Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987). If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)). Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The documentary evidence admitted in the administrative

proceedings below begins with records from the Veterans Administration ("VA") Outpatient Clinic dated January 20, 2006 where plaintiff was seen to establish a relationship with a primary care physician. At that time, plaintiff complained of a history of neck pain following a motorcycle accident many years earlier with a previous CT scan reportedly showing a "pinched nerve". Plaintiff also complained of acid reflux. He had neck pain radiating to the back but on physical examination deep tendon reflexes were +2, there was 5/5 strength throughout, and sensation was intact. The assessment was chronic neck pain and GERD. An MRI of the spine was to be obtained and plaintiff was started on medication to combat his GERD. (Tr. pp. 241-244).

The next medical records were not generated until over three years later when plaintiff returned to the VA Clinic for follow-up care of his chronic neck pain, GERD, allergic rhinitis, and hyperlipidemia. A physical examination that was done at the time produced unremarkable results and plaintiff was generally in good health for his age with the exception of neck tenderness that radiated to the arms bilaterally with occasional loss of sensation. There was no edema to the lower extremities and neurological functioning was intact. An x-ray of the cervical spine was interpreted as indicative of cervical spondylosis but those results were also deemed to be unremarkable. The assessment was GERD,

allergic rhinitis, chronic neck pain, and hyperlipidemia. Plaintiff was prescribed Omeprazaole, Loratadine, Naproxen, and Lovastatin and an MRI of the cervical spine was ordered. (Tr. pp. 236-241, 203).

The recommended MRI went forward on April 13, 2009. That testing revealed dessication of all of the cervical discs with multi-level disc space narrowing at varying degrees. Most prominently, there was moderate to severe bilateral foraminal narrowing at C5-6, possible bilateral uncinate spurring at C5-6, and some foraminal narrowing on the right at C6-7. There was also a 2 millimeter, broad-based posterior bulge of the C5-6 disc that extended to the level of the medical foramen bilaterally. (Tr. pp. 201-203, 184-185). Plaintiff returned to the VA Clinic on April 22, 2009 to obtain the results of the MRI which were characterized as abnormal. The neurosurgery department was to be consulted for evaluation and treatment possibilities in light of those findings. A physical exam was normal except for neck pain that radiated to the upper extremities bilaterally. The assessment was hyperlipidemia and neck pain with radiculopathy and Tramadol was added to plaintiff's medication regimen. Plaintiff was cleared to return to work the following day with the following limitations: no lifting greater than ten pounds; no tractor work due to bouncing; frequent rest periods; and, no standing, sitting, or stooping for

long periods of time, all due to cervical spine abnormalities. (Tr. pp. 233-236, 188).

By June 22, 2009, plaintiff reported increasing neck pain over the previous year with neck stiffness, numbness in the hands, and pain radiating down the arms bilaterally. On physical examination, plaintiff had 5/5 strength in the upper and lower extremities. A sensory examination revealed decreased sensation to pinprick in the C6 distribution, the left worse than the right, and a slight decrease in the right biceps reflex. Based upon the testing findings and the results of his examination, Dr. Ware recommended that plaintiff undergo a diskectomy with replacement of the C5-6 disc to alleviate his radiculopathy. Plaintiff's surgery was tentatively scheduled for July 30, 2009. (Tr. pp. 191-192).

Plaintiff returned to the VA Clinic for follow-up of his hyperlipidemia on July 1, 2009. He was experiencing no neck pain on that date. (Tr. pp. 229-232). However, by July 10, 2009, plaintiff described his lower back and neck pain at a level of "7" on a scale of "1" to "10" and stated that medication was not particularly effective. (Tr. pp. 225-227). Plaintiff was next seen at the VA Clinic on July 22, 2009 for pre-operative evaluation. He reported feeling well overall on that date and advised medical personnel that he was very active, farming forty acres of land and climbing four or more flights of stairs without becoming short of

breath. A chest x-ray taken at the time revealed a small band of opacity in the right apical area most likely representing a scar. The assessment was cervical disc disease and stable obesity/hyperlipidemia. (Tr. pp. 221-224, 200-201). A follow-up x-ray of plaintiff's chest that was taken as a precautionary measure revealed no apical abnormality. (Tr. p. 200).

On July 30, 2009, plaintiff underwent a C5-6 diskectomy via anterior cervical approach with the placement of an artificial disk at that level. There were no intraoperative complications and plaintiff was ultimately discharged with instructions to engage in activity as tolerated and with prescriptions for Naproxen/Naprosyn, Omeprazaole/Prilosec, Lovastatin/Mevacor, Vicodin, and Valium. (Tr. pp. 194-199, 180-183).

On August 15, 2009, plaintiff completed the Administration's form denominated "Function Report-Adult" that requested information on how his condition limited his activities. In that form, plaintiff indicated that a typical day consisted of rising in the morning, having coffee and breakfast with his wife, and helping wash the dishes that were not too heavy. Plaintiff then watched TV until noon, checked the mail and possibly talked with neighbors, and watched more TV until 4:30 p.m. After that, plaintiff and his wife prepared lunch, ate, cleaned the kitchen, and then rested a bit before retiring for the evening. As a result of his condition,

plaintiff stated that he could not walk, sit, or stand for long periods of time. Dressing, bathing, and hair care were problematic when plaintiff's neck hurt. Plaintiff's wife did all the cooking but he did assist with household chores. He was able to drive, go out alone, go shopping, tend to financial matters, play on the computer, and visit with others when his neck was not painful. Plaintiff could lift ten pounds but could not squat, bend, reach overhead, or kneel for long periods of time but he could walk a mile before needing to rest. His attention span and ability to follow instructions, get along with others, and handle stress were unaffected by his neck condition. (Tr. pp. 127-136).

Plaintiff was seen by Dr. Ware for post-operative evaluation on August 17, 2009 and reported that his neck pain had improved and that he no longer had pain down his arms although there was still some neck soreness and some residual swallowing issues which were improving over time. On physical examination, plaintiff had 5/5 strength in the upper and lower extremities and was able to flex and extend without any difficultly. Plaintiff was to follow-up with Dr. Ware in four weeks with the hope that he would be released from the doctor's care if he was doing well at that time. (Tr. p. 193).

On September 8, 2009, an Administration Medical Consultant ("MC") reviewed plaintiff's file and set forth his findings in a

"Physical Residual Functional Capacity Assessment" form that was designed to elicit opinions about plaintiff's capabilities. There, the MC indicated that plaintiff could occasionally lift and/or carry twenty pounds and could frequently lift and/or carry ten pounds; could sit, stand, and/or work for six hours per eight-hour workday; had an unlimited ability to push and/or pull; was limited in overhead reaching; and, had no postural, visual, communicative, or environmental limitations. In making those findings, the MC pointed to Dr. Ware's post-op evaluation note which indicated that plaintiff was experiencing less pain along with an improved range of motion. (Tr. pp. 245-253).

As noted earlier, a hearing de novo before an ALJ went forward on February 23, 2010. Plaintiff was fifty-two years of age at the time, lived with his wife, and had completed twelve years of formal education. Plaintiff testified to having last worked on July 28, 2009 after experiencing increasing problems with his neck. Leading up to his neck surgery, plaintiff had seen a VA doctor who ordered an MRI which revealed six dislocated discs and one bulging disc. Those results were then furnished to Dr. Ware and the decision was made to proceed with surgery. Two weeks post-surgery, plaintiff returned to Dr. Ware who remarked that he was doing well but might have some residual swallowing difficulties. After the ALJ pointed out that she had received no medical records subsequent to August

of 2009, plaintiff testified that he had seen Dr. Ware again in October of 2009 for complaints of neck pain and resulting migraine headaches which required him to lie down and prevented him from driving. Dr. Ware had reportedly sent plaintiff for x-rays and two CAT scans but his insurance coverage expired after that and treatment could not be pursued further. Plaintiff had applied for VA benefits and that matter remained pending. (Tr. pp. 25-30).

Following this testimony, a discussion ensued in which plaintiff's attorney reported that she had requested updated medical records from the Tulane Medical Center and the ALJ explained that the updated records were needed to properly evaluate any residual problems that remained following plaintiff's surgery. Counsel even questioned whether a consultative evaluation for plaintiff would be helpful in determining his entitlement to Social Security benefits. For his part, plaintiff testified that he had been to several follow-up appointments with Dr. Ware although he had not kept the last one that had been scheduled in January. Plaintiff had reportedly been told by Dr. Crochet of the VA that his surgery would not fully alleviate his neck symptoms and he had also advised Dr. Ware in October of 2009 of residual problems with numbness, muscle spasm, and an inability to sleep. After plaintiff expressed a willingness to attend a consultative evaluation, the ALJ determined that the appropriate course of action was to obtain

any outstanding Tulane and VA records and to submit them to the consultative examiner for his or her review before the consultative evaluation occurred. (Tr. pp. 30-37).

After being tendered to his attorney for questioning, plaintiff testified to experiencing pain upon neck motion and an inability to hold his head in a position to read for more than five minutes. On a scale of "1" to "10", plaintiff testified to experiencing neck pain at a level of "15" as the hearing was in progress. When plaintiff experienced excessive neck pain that would often trigger migraine headaches behind his right eye and he would have to lie down. Such headaches would sometimes cause nausea and vomiting and would sometimes last one to two days; medication did not alleviate these headaches or plaintiff's neck pain. Plaintiff also experienced a "sensation" to the back between the shoulder blades such that he could hardly move as well as leg numbness and an inability to walk for long periods of time due to hip pain. Additional symptoms included muscle spasms to the body as a whole which interfered with sleep, occasional hand numbness accompanying the neck pain, moreso on the right, and muscle spasms up and down the arm and hand. Plaintiff was known to occasionally drop things and to slip and fall, thus causing him to apply for a handicap parking permit. He had realized no improvement from his surgery, arm numbness occurred two to three times per week, and he

also suffered from acid reflux. Reflecting back on his most recent job as a landscaping/maintenance worker, plaintiff testified that traversing uneven terrain when driving a tractor elicited pain as did encountering speed bumps when operating a car. Other past work included that as a mechanic and in oil spill cleanup which had lasted only a few months. (Tr. pp. 37-44).

Patricia Riggle, a VE, was the next witness to take the stand. She began by classifying plaintiff's past job as a maintenance worker as involving heavy, skilled work and that of his past job as an auto mechanic as involving medium, skilled work. The ALJ then posed a series of hypothetical questions to the VE, as follows. In the first hypo, the VE was asked to assume an individual who was capable of performing a limited range of light work with no climbing of ladders/ropes/scaffolds; occasional climbing of ramps/stairs; no work involving repetitive rotation, flexion, or extension of the neck; only frequent reaching bilaterally; and, occasional overhead reaching bilaterally. With those limitations in mind, the VE testified that the individual described in the hypothetical question would be unable to perform plaintiff's past work. In the second hypothetical question, the VE was asked to assume the same profile as the first one but the individual needed the option to alternatively sit and stand provided that he was not off-task more than 10% of the work period. Faced with those added

15

limitations, the VE testified that the described individual could not perform plaintiff's past work. (Tr. pp. 44-46).

In the third hypothetical question, the VE was asked whether a person of plaintiff's age, education, and past work experience who was capable of the limited range of light work described in the first hypothetical was able to perform any other jobs that existed in the local and national economies. In answer to that question, the VE identified the positions of cashier, interviewer, and general office clerk that the described individual was capable of performing. A fourth hypo was then posed to the VE by the ALJ which envisioned an individual of plaintiff's age, education, and work experience who was capable of the limited range of light work described in the first hypo and who needed a sit/stand option as described in the second hypo. Once again, the VE cited a reduced number of available cashier, interviewer, and general office clerk positions to account for the sit/stand option. Finally, the ALJ posed a fifth hypothetical question to the VE which assumed an individual who was unable to maintain work on a regular, continuing basis due to the combined effect of medical conditions and pain. In answer thereto, the VE testified that the described individual would be unable to work. After plaintiff's attorney indicated that he had no questions for the VE, plaintiff testified that despite receiving a high school diploma he had attended vocational/special

education classes and had reportedly repeated the second and third grades four times. The record was left open by the ALJ for the submission of additional medical records and the results of the contemplated consultative evaluation. (Tr. pp. 46-51).

Subsequent to the administrative hearing, plaintiff returned to the VE Clinic on February 25, 2010 to undergo a Compensation and Pension Examination ("CPE") at the hands of Dr. Henry Bienert. As part of his evaluation, the doctor recalled plaintiff's 1979 motor vehicle accident with resulting neck pain and his diskectomy in 2009. Plaintiff was said to be experiencing moderate pain one-to-two days per week which lasted one-to-two days at a time but with no radiation of the pain. He had no atrophy, guarding, pain with motion, tenderness, or weakness. Lateral flexion of the cervical spine was limited to 25 degrees on the left and to 35 degrees on the right. Strength was 5/5 and reflexes were normal throughout. A CT scan revealed the hardware at C5-6 but no spinal stenosis or neural foraminal narrowing at the other levels of the cervical spine and with only minimal degenerative changes. The diagnosis was post-op cervical procedure for degenerative disc disease with herniation with a resulting "severe" effect on playing sports, a "moderate" effect on performing chores, shopping, and exercising, and no effect on recreation, traveling, feeding, bathing, dressing, toileting, and grooming. Based upon a review of the records he had

been provided and the results of his physical examination, Dr. Bienert believed that plaintiff's cervical problem was likely related to the service-connected injury he had sustained in 1979. (Tr. pp. 255-278).

The final piece of documentary evidence that was admitted in the proceedings below was plaintiff's formal notification of benefits from the Department of Veterans Affairs. In that notice, plaintiff was denied entitlement to non-service-connected pension benefits but was awarded compensation benefits for a 10% disability effective September 2, 2009. (Tr. pp. 279-289).

Plaintiff challenges the Commissioner's decision to deny DIB on two grounds. In the first of those, plaintiff alleges that the ALJ's assessment of his residual functional capacity ("RFC"), that he was capable of performing a reduced range of light work, is not supported by substantial evidence. In his second challenge, plaintiff argues that the ALJ erred in failing to consider the fact that he had been awarded VA benefits. Those challenges will be addressed in the order in which they were presented.

Plaintiff's first challenge to the Commissioner's decision is that the ALJ's finding that he retained the RFC to perform a limited range of light-level work is not supported by substantial evidence. Plaintiff alleges that the examination findings from Dr. Bienert directly contradict the opinions of the Administration's MC

and that the ALJ failed to explain how the restrictions noted by Dr. Bienert were consistent with an RFC assessment for a limited range of light work. (Rec. doc. 9-2, pp. 4-5).

At step three of the §404.1520 analysis, the ALJ found that plaintiff's condition did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. p. 11). Plaintiff does not challenge that finding here. Having so found, the Regulations mandated that the ALJ make an assessment of plaintiff's RFC which is defined as what a claimant can still do in spite of his limitations. 20 C.F.R. §§404.1520(e), 404.1545. Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining an individual's RFC at the hearing level lies with the ALJ. 20 C.F.R. §§404.1527(e)(1), 404.1546(c). Given the regulatory charged nature of that duty, an ALJ must make an assessment of a claimant's RFC even where the record is devoid of such an assessment by a medical source; such an assessment is not a medical opinion at all. Joseph-Jack v. Barnhart, 80 Fed.Appx. 317, 318 (5th Cir. 2003).

In assessing plaintiff's RFC, the ALJ cited several valid reasons for discounting his allegations of functional limitations precluding the performance of all work-related activities. Included in those were that the record failed to show any ongoing therapy or use of pain medication which was suggestive of only mild

and manageable symptoms. (Tr. p. 12). The lack of such treatment can properly be considered by the ALJ in adjudicating a claimant's disability status. <u>Villa</u>, 895 F.2d at 1024. In addition, the activities that plaintiff reported that he was capable of were at odds with his claim of an inability to perform any work. When seen for pre-operative evaluation on July 22, 2009, plaintiff advised medical personnel that he was very active and was able to farm forty acres of land and to climb four or more flights of stairs without becoming short of breath. Upon discharge following surgery, plaintiff was advised to engage in activity as tolerated. When he was seen by Dr. Ware on August 17, 2009 for post-operative evaluation, he reported that his neck pain had improved with no pain radiating down his arms although some neck soreness and improving swallowing issues remained. Plaintiff had 5/5 strength in the upper and lower extremities and was able to flex and extend without any difficulty. At that time, Dr. Ware imposed no restrictions on plaintiff's abilities, another permissible consideration. <u>Vaughan v. Shalala</u>, 58 F.3d 129, 131 (5th Cir. 1995). Plaintiff was to follow-up with Dr. Ware four weeks later with the expectation that he would be released from the doctor's care if he was doing well at that time. Plaintiff would subsequently testify at the administrative hearing that he had been seen by Dr. Ware again in October of 2009 but although the record

was left open for the submission of that report, none was forthcoming. Here again, the lack of objective evidence demonstrating ongoing therapy or treatment does not point to a total inability to work. Villa, 895 F.2d at 1024.

In the Function Report that he completed approximately two weeks following his surgery, plaintiff stated that he could perform household chores, drive, shop, and walk one mile before needing to rest. Plaintiff's ability to perform such activities is not indicative of someone who is unable to perform any work whatsoever, Leggett v. Chater, 67 F.3d 558, 565 n.12 (5th Cir. 1995), and reports such as the Function Report may properly be considered by the ALJ in determining a claimant's disability status. Vaughan, 58 F.3d at 131.

Subsequent to the administrative hearing, plaintiff saw Dr. Bienert for a CPE and admittedly had some limitation to range of motion of the cervical spine. However, he had no atrophy, guarding, pain with motion, tenderness, or weakness; strength was 5/5 and reflexes were normal throughout. Although Dr. Bienert reported a "severe" effect on plaintiff's ability to play sports and a "moderate" effect on his ability to perform chores, shop, and exercise, those terms were not defined and were, at any rate, not binding upon the Commissioner. Despite such effects, plaintiff was ultimately assigned only a 10% disability rating by the VA. The

ALJ's RFC assessment for a limited range of light-level work more than adequately accounts for the 10% disability rating. <u>K.D.H. v. U.S. Comm. Soc. Sec. Adm</u>., No. 09-CV-0679, 2010 WL 3037269 at *3 (W.D. La. Aug. 3, 2010). In her written decision of July 1, 2010, the ALJ did not even mention the findings of the Administration's MC. As noted earlier, the Regulations mandate that the ALJ make an assessment of a claimant's RFC even where there is no such assessment in the record from a medical source. Given the totality of the evidence that was before her, including Dr. Bienert's CPE findings, the Court believes that the ALJ's RFC assessment was a correct one.

In his second challenge to the Commissioner's decision, plaintiff argues that the ALJ erred in failing to consider the fact that he was awarded VA disability benefits. (Rec. doc. 9-2, pp. 5-6).

In addressing this challenge, it appears that the ALJ herself was never alerted to the VA's award of benefits. Based upon a review of the ALJ's decision of July 1, 2010, it is apparent that she was aware of Dr. Bienert's CPE findings of February 25, 2010 as she discussed them at some length in assessing plaintiff's RFC. (Tr. pp. 13-14). However, it does not appear that the ALJ was ever provided with the VA's benefits notification of June 25, 2010 in which plaintiff was assigned a 10% disability rating. The first

mention of that notification appears on the second page of plaintiff's counsel's July 16, 2010 appeal brief to the AC which references a copy of the notification as having been enclosed. (Tr. pp. 175-179). That notification was received by the Commissioner's Office of Disability Adjudication and Review on July 20, 2010, some nineteen days after the issuance of the ALJ's decision. (Tr. p. 289). Obviously, the ALJ cannot be faulted for failing to consider information that she was never provided.

Nevertheless, it does appear that the AC was aware of the VA's award of benefits as counsel's appeal brief of July 16, 2010 was specifically identified as evidence that the AC considered. (Tr. p. 1). In a fairly recent discussion of the weight to be afforded to a VA's award of benefits, the Fifth Circuit opined as follows:

> [a] VA rating of <u>total</u> <u>and</u> <u>permanent</u> <u>disability</u> is not legally binding on the Commissioner because the criteria applied by the two agencies is different, but it is evidence that is entitled a certain amount of weight and must be considered by the ALJ. *See Loza v. Apfel*, 219 F.3d 378, 394 (5th Cir. 2000); *Latham v. Shalala, 36 F.3d 482, 483 (5th Cir. 1994); Rodriguez v. Schweiker,* 640 F.2d 682, 686 (5th Cir. 1981). In *Rodriguez* and its progeny, we have sometimes referred to a VA disability determination as being entitled to "great weight." While this is true in most cases, the relative weight to be given this type of evidence will vary depending upon the factual circumstances of each case. Since the regulations for disability status differ between the SSA and the VA, ALJs need not give "great weight" to a VA disability

> determination if they adequately explain the
> valid reasons for not doing so.

> <u>Chambliss v. Massanari</u>, 269
> F.3d 520, 522 (5th Cir.
> 2001)(emphasis added).

In <u>Chambliss</u>, in the three previous Fifth Circuit cases that it cited, and in the two additional cases that plaintiff relies upon, the plaintiff/claimants had all been assigned a 100% disability rating by the VA. Even in the face of such a rating, the <u>Chambliss</u> court emphasized that the relative weight to be given to that evidence depends on the facts of each individual case. <u>Chambliss</u>, 269 F.3d at 522. However, unlike those Fifth Circuit cases, the plaintiff in the matter at hand was assigned only a 10% disability rating. It is thus questionable whether the ALJ was required to consider that percentage even if she had been made aware of it. <u>K.D.H.</u>, No. 09-CV-0679, 2010 WL 3037269 at *2 (citing <u>Peel v. Astrue</u>, 2009 WL 3028300 at *7 (N.D. Fla. 2009)). In any event, any error stemming from any lack of discussion of the VA rating was harmless here as 10% rating was more than adequately accounted for in the ALJ's RFC for a limited range of light-level work. <u>Id</u>. at *3. As was discussed earlier, because the Court believes that the ALJ's RFC assessment was a correct one, reversible error is not apparent here.

Finally, by way of a supplemental memorandum that plaintiff

was allowed to file with leave of court, he asks that his case be remanded to the Commissioner for the consideration of new and material medical evidence. (Rec. doc. 12-1). The evidence for which a remand is sought is the report of a CT scan that was performed on September 14, 2009 which revealed, <u>inter</u> <u>alia</u>, moderate right and mild left neural foraminal narrowing at C5-6 and multilevel anterior osteophytosis and uncovertebral degenerative changes. (Rec. doc. 12-2).

The Court can order that a case be remanded to the Commissioner to consider new medical evidence "... only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g). In order to justify a remand, three criteria must be satisfied. <u>Ripley v. Chater</u>, 67 F.3d 552, 555 (5th Cir. 1995); <u>Pierre v. Sullivan</u>, 884 F.2d 799, 803 (5th Cir. 1989). First, the evidence must be both "new" and not merely cumulative of what is already in the record. <u>Szubak v. Secretary</u>, 745 F.2d 831, 833 (3rd Cir. 1984). Second, the evidence must be "material" such that there is a "reasonable possibility" that the evidence would have changed the outcome of the Commissioner's decision. <u>Latham v. Shalala</u>, 36 F.3d 482, 483 (5th Cir. 1994)(citing <u>Chaney v. Schweiker</u>, 659 F.2d 676, 679 (5th Cir. 1981)). The materiality requirement also contains a temporal

element that the evidence relate to the time period for which benefits were denied. Latham, 36 F.3d at 482. Finally, the claimant must demonstrate good cause for not having incorporated the new evidence into the prior administrative record. Pierre, 884 F.2d at 803.

In addressing plaintiff's request for a remand the Court notes that the CT scan in question was performed on September 14, 2009 which was over five months prior to the administrative hearing and some ten months prior to denial of plaintiff's request for review by the AC. Because the evidence came into existence long before the Commissioner's determination became final, it is not "new". See Latham, 36 F.3d at 483 (evidence is "new" if issued after Secretary's determination); Haywood v. Sullivan, 888 F.2d 1463, 1471 (5th Cir. 1989)(evidence is "new" if not in existence at the time of administrative and district court proceedings). Nor does plaintiff establish any cause, much less good cause, for not presenting the evidence sooner. Either of these two criteria, standing alone, is sufficient to defeat plaintiff's request for a remand. Even if that were not the case, the results of the CT scan were not material as they were not necessarily at odds with the one that was performed at the VA in February of 2010 which revealed no spinal stenosis or neural foraminal narrowing at levels other than C5-6 and minimal degenerative changes.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this  13th  day of _____August_____, 2012.


_____
ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE